TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section
DAN G. BOYLE (Cal. Bar No. 332518)
Assistant United States Attorney
Asset Forfeiture Section
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-
    Facsimile: (213) 894-0142
    E-mail: daniel.boyle2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>$1,015,157.89 IN U.S. CURRENCY,<br><br>             Defendant.<br><br>SHAOBO YU and XIN QI,<br><br>             Claimants. | No. CV 19-cv-2396-JDE<br><br>**GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES; STATEMENT OF UNCONTROVERTED FACTS; DECLARATION OF AUSA DAN G. BOYLE AND EXHIBITS**<br><br>Hearing Date: April 21, 2022<br>Hearing Time: 10:00 a.m.<br><br>Hon. John D. Early |

    Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorney Dan G. Boyle, hereby

files its Motion for Partial Summary Judgment.

This Motion is based upon the attached Memorandum of Points and Authorities; the attached Statement of Uncontroverted Facts, the Declaration of AUSA Dan G. Boyle and attachments thereto; all pleadings and papers in this action; any other and further authority and argument that may be presented at any hearing on this motion; and any matters of which the Court may take judicial notice.

Dated: March 18, 2022                Respectfully submitted,

                                     TRACY L. WILKISON
                                     United States Attorney

                                     SCOTT M. GARRINGER
                                     Assistant United States Attorney
                                     Chief, Criminal Division
                                     JONATHAN GALATZAN
                                     Assistant United States Attorney
                                     Chief, Asset Forfeiture Section


                                            /s/
                                     _____
                                     DAN G. BOYLE
                                     Assistant United States Attorney

                                     Attorneys for Plaintiff
                                     UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                                 PAGE

TABLE OF AUTHORITIES................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION.................................................1

II.   RELEVANT FACTS..............................................2

      A.   Persons and Companies Are Victimized by Fraud.........2

      1.   Victim Company 1 ("VC1")..............................2

      2.   Victim Company 2 ("VC2")..............................3

      3.   Victim S.C............................................3

      4.   Victim Company 4 ("VC4").............................4

      5.   Victim W.H............................................5

      6.   Victim K.B...........................................6

      7.   Victim C.H.-2.........................................7

      8.   Victim T.K...........................................7

      9.   Victim S.H...........................................8

      10.  Victim A.M...........................................9

      B.   Relevant Procedural History..........................10

      C.   Status of Relevant Discovery.........................10

II.   RELEVANT LAW...............................................11

      B.   Summary Judgment Standards...........................11

      C.   Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)&(C)...13

III.  ARGUMENT...................................................15

      A.   The Court Should Find there is No Factual Dispute as
           to the Fraud Upon the Victims........................15

IV.   CONCLUSION.................................................18

i

1

### TABLE OF AUTHORITIES

2

**CASES**

3

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)........................................12

4

Gussin v. Nintendo of Am. Inc.,
    No. CV 93-4308 LGB (BX), 1994 WL 747889 (C.D. Cal. Oct. 6,

5

1994)......................................................16

6

Kaminska v. Lai,
    No. CV 19-1577-MCS (JEM), 2021 WL 536511 (C.D. Cal. Jan.

7

19, 2021)..................................................16

8

Marks v. United States,
    578 F.2d 261 (9th Cir. 1978)..............................12

9

Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).......................................12

10

11

McGuigan v. City of Fontana,
    No. ED-CV-10-00278-DMG-VBKX, 2011 WL 13223888 (C.D. Cal.

12

Jan. 26, 2011)............................................16

13

National Union Fire Ins. Co. v. Argonaut Ins. Co.,
    701 F.2d 95 (9th Cir. 1983)...............................12

14

Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins.
    Co.,

15

    701 F.2d 95 (9th Cir. 1983)...............................17

16

United States v. $133,420 in U.S. Currency,
    672 F.3d 629 (9th Cir. 2012)..............................14

17

United States v. Maxwell,
    920 F.2d 1028 (D.C. Cir. 1990)............................17

18

19

**STATUTES**

20

18 U.S.C. § 1343.......................................13, 14

21

18 U.S.C. § 981(a)(1)(A)...................................13

22

18 U.S.C. § 981(a)(1)(C)...................................13

18 U.S.C. § 983............................................14

23

18 U.S.C. § 1343...........................................13

24

18 U.S.C. § 1956(c)(7).....................................13

**RULES**

25

Fed.R.Civ.P. 56.......................................passim

26

Ninth Cir. Model Crim. Jury Instruction No. 15.35.........15

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

I.   INTRODUCTION

Plaintiff United States of America ("Plaintiff" or "the Government") now moves this Court for partial summary judgment pursuant to Fed.R.Civ.P. 56(a) (the "Motion" or "Mot.").

In a civil forfeiture proceeding in rem such as this, the Government bears the burden of establishing, by a preponderance of the evidence, that the defendant res is subject to forfeiture. Functionally, this burden consists of two parts: (1) the Government must establish the commission of an offense or offenses giving rise to forfeiture, and (2) the Government must establish that the defendant res is traceable to, or involved in, such an offense.

The Government mow moves for partial summary judgment on the first of these two elements for each cause of action stated in the Consolidated Master Complaint. As detailed in the accompanying Statement of Uncontroverted Facts (the "SUF") at least ten victims of fraud have stated, under penalty of perjury, that they collectively transferred millions of dollars in funds based on fraudulent misrepresentations, and are thus victims of fraud.

At this time, the Government is not moving for summary judgment on the second part of its burden here – tracing the defendant res.

Claimants have already stated during discovery they were unable to deny basic facts about the fraud upon the victims identified herein, and there has been no discovery since that time which might give the Claimants a basis to deny the same facts now. Summary judgment on this element should be granted, and the parties can move to trial on the second part of the Government's burden without the

1   need to call nearly a dozen victim-witnesses whose testimony is
2   effectively undisputed.

3   **II.  RELEVANT FACTS**

4       Because the Government is seeking only partial summary judgment
5   here, the recitation of facts herein is limited to those facts
6   relevant in this Motion.

7       **A.    Persons and Companies Are Victimized by Fraud**

8       Between 2015 and 2018, at least fourteen persons and
9   corporations were defrauded through electronic means, typically
10   through romance scams, confidence scams, or compromised email fraud
11   (the "Victims"), all of whom are identified pseudonymously in the
12   Consolidated Master Complaint for Forfeiture in this action (the
13   "CMC").[1] See generally ECF No. 64.

14       **1.    Victim Company 1 ("VC1")**

15       In December of 2016, an accountant for VC1 received an email
16   that appeared to be from VC1's president, which requested that the
17   accountant execute a wire transfer of $28,600.00 from VC1's accounts
18   to a Wells Fargo Bank account held in the name of JD Bulk
19   Incorporated, ending in '6297 ("WFB Account '6297"). See SUF ¶ 1.
20   This email was fraudulent, and VC1's president never actually
21   instructed the company's accountant to wire any funds to WFB Account
22   '6297. See SUF ¶ 2. Based on this fraudulent email, VC1's accountant
23   wired $28,600.00 from VC1's accounts to WFB Account '6297. See SUF

24

25   ————————————

26      [1] Certain of the Victims identified in CMC did not respond when
    contacted by the Government sufficiently in advance of the filing of
27   this motion, and as such, the Government does not offer evidence from
    these Victims for the purposes of this motion. The Government
28   reserves the right to call each of Victims as witnesses at trial as
    necessary, and does not waive any claims by electing not to
    adjudicate facts as to any of the Victims on summary judgment.

¶ 3. When VC1's president learned of this fraud, he reported the fraud to the local police and the FBI. See SUF ¶ 4. VC1 suffered a loss of $28,600 as a result and VC1's business insurance would not cover the loss. See SUF ¶ 5.

### 2.   Victim Company 2 ("VC2")

In December of 2016, E.H. maintained a retirement account with VC2. See SUF ¶ 6. On or about December 20, 2016, VC2 received electronic ACH instructions, purportedly from E.H., directing an ACH in the amount of $724,395.13 from E.H.'s individual retirement account to an account at TD Bank ending in 6201 held (the "TD Bank '6201 Account"). See SUF ¶ 7. Based on these ACH instructions, on December 21, 2016, VC2 wired $724,395.13 to the TD Bank '6201 Account. See SUF ¶ 8. These ACH instruction were fraudulent, and E.H. never instructed VC2 to transfer any funds to the TD Bank '6201 Account. See SUF ¶ 9. VC2 investigators interviewed E.H. in December of 2016 and learned that E.H. did not have any email account associated with the ACH instructions sent to VC2 that month, that E.H. did not conduct online banking on his VC2 account, that E.H. relied on his financial advisor for any information on his VC2 account, and that E.H. did not have any connection to the TD Bank '6201 Account. See SUF ¶ 10. As a result of the transfer to the TD Bank '6201 Account, VC2 reimbursed E.H.'s account, and suffered a net loss of $237,085.59, after accounting for funds recovered from the TD Bank '6201 Account. See SUF ¶ 11.

### 3.   Victim S.C.

Victim S.C. met a person who went by the name Gilbert Roberts ("Roberts") on an internet dating website in 2012 and was in communication with Roberts by email and phone from 2012 to 2016. See

SUF ¶ 12. While S.C. never met Roberts in person, they discussed getting married numerous times, and on two occasions set a wedding date, but Roberts called off both planned wedding dates, claiming he was sick or would be out of town for work. See SUF ¶ 13. During these communications, Roberts told S.C. that he owned an oil company in Nigeria and sent S.C. what appeared to be business documents showing that he owned such a business. See SUF ¶ 14. Over the approximately five years they communicated, Roberts would ask S.C. for funds to help fund his purported oil business. See SUF ¶ 15. In addition, Roberts told S.C. that he would get funds from investors for his oil business, and asked S.C. if those funds could be deposited into her bank accounts, and then forwarded to accounts that Roberts provided. See SUF ¶ 16. Based on Roberts' statements to S.C., she wire transferred approximately $500,000 from her bank accounts to bank accounts that Roberts provided. See SUF ¶ 17. Among these transfers, S.C. wired at least $64,000 in August of 2016, over three transfers, to accounts Roberts identified to S.C. based on his statements to S.C. See SUF ¶ 18. Roberts' promises and statements to S.C. were fraudulent, and S.C. was scammed by Roberts. See SUF ¶ 19. She did not receive anything in return for her transfers despite Roberts' promises to pay her from his purported oil business, which does not appear to have existed. See SUF ¶ 20.

### 4.   Victim Company 4 ("VC4")

In March of 2016, VC4's office manager received an email that purported to be from the co-owner of VC4. See SUF ¶ 21. This email requested a wire transfer of $157,773 to HSBC Bank, beneficiary name Anrock Technology HK Co. LTD, at address 1 Queen Road Central, Hong Kong, account number ending '4838 (the "HSBC '4838 Account"). See SUF

4

¶ 22. This communication was fraudulent, and none of VC4's owners had instructed VC4's office manager to wire any funds to the HSBC '4838 Account. See SUF ¶ 23. Based on this fraudulent email, VC4's office manager wired $157,763.00 from VC4's accounts to the HSBC '4838 Account. See SUF ¶ 24. VC4's controller discovered the fraud the next day and attempted to recall the wire, but the funds were no longer available for recall. See SUF ¶ 25. As a result, VC4 suffered a loss of $157,773. See SUF ¶ 26.

### 5. Victim W.H.

In January 2016, W.H. was contacted via LinkedIn by someone who went by the name Ashley Laura Branson ("Branson"), and W.H. was subsequently in communication with Branson by telephone and email from approximately February to August 2016. See SUF ¶ 27. In February 2016, Branson claimed she had inherited land in South Africa, which she wanted to sell, and asked W.H. for help advising her and paying fees that would result from selling the land. See SUF ¶ 28. Branson stated that she would repay W.H. any funds he loaned with 10% interest. See SUF ¶ 29. Based on their discussions, W.H. believed that Branson was a potential business partner regarding the land she claimed to have inherited. See SUF ¶ 30. Over the next approximately six months, Branson asked for W.H.'s help paying a variety of taxes, fees, and other costs associated with the supposed land in South Africa, and W.H. asked Branson to sign a promissory note prior to sending any funds, which Branson agreed to do. See SUF ¶ 31. Branson also purported to send W.H. a wire transfer of $10,000,000 from an HSBC account in Hong Kong to W.H.'s bank account related to this investment, but only $10,000 of these funds actually arrived. See SUF ¶ 32. Based on Branson's communications, W.H. ultimately transferred approximately $3.8 million dollars to accounts provided by Branson.

5

See SUF ¶ 33. Branson's communications were fraudulent, and W.H. received nothing in return for his transfers of funds, and the funds loaned were never returned. See SUF ¶ 34. W.H. suffered a loss of at least $3,851,500 as a result of this scam. See SUF ¶ 35.

### 6.    Victim K.B.

In 2017, K.B. began communicating with someone who went by the name Steve Hoffman ("Hoffman") on the internet dating website Match.com and communicated by telephone and text messages from 2017 to 2018. See SUF ¶ 36. Hoffman stated that he owned a construction company in Santa Barbara, California, and that he was currently in the Philippines working a construction job. See SUF ¶ 37. Hoffman told K.B. that he needed money to pay expenses for this construction business and asked if K.B. would send him money, promising that he was going to get $1,000,000 from Europe for another construction job and would use that money to reimburse K.B. See SUF ¶ 38. Based on Hoffman's promise of reimbursement, K.B. made bank teller transfers of $5,000 and $18,500 from her bank account to a Bank of America account ending in '7422 (the "BofA '7422 Account"). See SUF ¶ 39. In addition to the transfers to the BofA '7422 Account, based on Hoffman's promises, K.B. wired a total of $187,300, to a bank account at Bank of China in the name of Fuzhou Shaunxiang Suitcase Company Limited. See SUF ¶ 40. When K.B. asked Hoffman to be reimbursed for the money she had sent, he refused to return any money, and instead kept asking for more money, and when K.B. refused to transfer any more money, Hoffman broke off contact. See SUF ¶ 41. K.B. was never reimbursed as promised by Hoffman, and no funds K.B. loaned were returned. See SUF ¶ 42. K.B. suffered a loss of at least $210,800. See SUF ¶ 43.

### 7.   Victim C.H.-2

In 2016, C.H.-2 received an unsolicited email from someone who went by the name Stacey Ransom ("Ransom"), advising him that he had won a $10.5 million lottery from United Bank of Africa and could access those funds once he paid funds required for legal and other fees. See SUF ¶ 44. In addition, from 2017 to 2019, C.H.-2 was contacted by a person who went by the name Barbara Minsky ("Minsky"), who ultimately, via email, represented to C.H.-2 that she had been arrested while travelling to Germany. See SUF ¶ 45. This communication was followed by another email from a person who went by the name Dennis Minsky, and identified himself as Minsky's brother, and requested $80,000 to help get Minsky out of jail. See SUF ¶ 46. Based on Ransom and Minsky's statements to C.H.-2, between 2016 to 2017, he deposited at least $108,000 into a number of different bank accounts at Bank of America. See SUF ¶ 47. In addition, also based on Ransom and Minsky's statements to C.H.-2, he made a $2,300 wire transfer to a Wells Fargo Bank account ending in '9768. See SUF ¶ 48. Finally, based on Ransom and Minsky's statements, C.H.-2 mailed payments using MoneyGram and United States Postal money orders as directed. See SUF ¶ 49. Ransom and Minsky's statements to C.H.-2 were fraudulent, and C.H.-2 did not receive any lottery payments or anything else in return for his deposits and did not see any proof that his money went to help anyone out of jail. See SUF ¶ 50 C.H.-2 suffered a loss of at least $108,000 as a result of these scams. See SUF ¶ 51.

### 8.   Victim T.K.

In or about 2017, T.K. began an online relationship over Facebook with a person who claimed to be named Sherry ("Sherry"). See

SUF ¶ 52. Between approximately February and May 2017 Sherry
repeatedly requested funds from T.K. for a variety of fraudulent
pretenses, including requesting wire transfers to keep her from being
deported or evicted and claiming that her father was an attorney in
South America who needed money to unlock his fortune. See SUF ¶ 53.
Sherry also requested that T.K send her gift cards and money to
purchase plane tickets so she could meet T.K. in the United States.
See SUF ¶ 54. Based on these communications from Sherry, over the
next several months, T.K. transferred at least $19,000 at Sherry's
direction and incurred substantial credit card debt at her direction.
See SUF ¶ 55. As a result of this new debt, T.K. and his spouse filed
for bankruptcy in 2018. See SUF ¶ 56. At the time of these transfers
T.K. was suffering from serious mental distress, which was initially
suspected to possibly be related to the onset of dementia but has
since been diagnosed as depression and anxiety. See SUF ¶ 57. These
communications from Sherry were fraudulent, T.K. never met Sherry or
received anything from these transfers and was scammed by Sherry. See
SUF ¶ 58. T.K. suffered a loss of at least $19,000 as a result of
this scam. See SUF ¶ 59.

### 9.  Victim S.H.

In 2016, S.H. started communicating with someone who identified
himself as a male on Facebook Messenger, who told S.H. that he was
serving in the United States military and was currently stationed in
Syria. See SUF ¶ 60. In or about May 2017, this person asked S.H. to
help with a transfer to his mother's bank account in the United
States, and a few days later, S.H. received a $7,500 wire transfer to
her account at Bank of America and was asked to transfer $5,000 to a
different Bank of America account. See SUF ¶ 61. Shortly after

8

receiving the $7,500 transfer, Bank of America closed S.H.'s account and informed her that the $7,500 wire she received appeared to be fraudulent. See SUF ¶ 62. S.H. messaged the person about the incident, but he told her that the funds transferred were good. See SUF ¶ 63. After this, S.H. stopped communicating with this person based on a belief that she had been lied to by the unidentified male to get her to move fraud money for him. See SUF ¶ 64.

### 10.  Victim A.M.

In early 2016, A.M. met a person on Facebook.com who went by the name Manuel Bayanai ("Bayanai") and communicated with Bayanai electronically. See SUF ¶ 65. Bayanai told A.M. he was originally from Sweden and was a U.S. citizen living in Columbus, Ohio. See SUF ¶ 66. After communicating for a few months, Bayanai told A.M. that he was doing a $6.7 million construction job in Phonm Penh, Cambodia, but that upon completing the project, he had to pay funds to the Cambodian government for taxes and the United Nations for money transfer fees. See SUF ¶ 67. Bayanai asked A.M. to wire transfer and deposit funds to bank accounts that he provided and promised that he would reimburse A.M. with funds he had in a bank in Cambodia. See SUF ¶ 68. A.M. was concerned with transferring money to someone she had not met in person, but after expressing her concerns to Bayanai about his identity, Bayani emailed a United States of America passport photo-page. See SUF ¶ 69. Between 2016 and 2017, A.M. made wire transfers and deposited funds for approximately $500,000 to accounts that Bayanai provided. See SUF ¶ 70. These transfers and deposits included depositing $9,000 and $9,000 in July of 2017 into a Bank of America account ending in '7448. See SUF ¶ 71. Bayanai's communications to A.M. were fraudulent, as A.M. was never reimbursed as promised by Bayanai, and the funds by her loaned were never

returned. See SUF ¶ 72. A.M. ultimately suffered a loss of approximately $500,000 as a result of this scam. See SUF ¶ 73.

**B.    Relevant Procedural History**

On March 29, 2019, the Government filed a Verified Complaint for Forfeiture as to defendant $959,946.00 in Bank Funds, alleging generally that the defendant funds were traceable to, or involved in, fraud upon the Victims. See ECF No. 1. On August 28, 2019, the Government filed a First Amended Verified Complaint for Forfeiture as to defendant $959,946.00 in Bank Funds. See ECF No. 29.

On February 16, 2021, the Government filed a Verified Complaint for Forfeiture in United States of America v. $43,590.79 in Bank Funds Seized from Two Wells Fargo Bank Accounts, et al., Case No. CV 21-01380-SB-JPR (the "1380 Action"), again generally alleging that the defendant funds there were traceable to, or involved in, fraud upon the Victims.

On November 17, 2021, the parties filed a stipulation to consolidate the actions, and for the Government to file a Consolidated Master Verified Complaint for Forfeiture. See ECF No. 60. On November 23, 2021, this court entered an order consolidating the 1380 Action into this action, and on November 19, 2021, the Government filed the CMC as to the consolidated defendant, $1,015,157.89 in Bank Funds, on November 19, 2021. See ECF No. 64.

**C.    Status of Relevant Discovery**

On January 31, 2022, the Government served Requests for Admission on the Claimants pursuant to Fed.R.Civ.P. 36 (the "RFAs"), generally requesting that Claimants admit that each of the Victims identified pseudonymously in the CMC and identified in full in discovery were, in fact, victims of fraud, and transferred funds as alleged in the CMC.

On February 7, 2022, Claimants responded by letter, stating generally that "both Claimants lack information or knowledge to admit or deny as the information known or readily obtainable is insufficient," and on February 28, 2022, Claimants served their responses and objections to the RFAs, responding to essentially all the RFAs with the following:

> Responding Party lacks information or knowledge to admit or deny this request. Responding party has made a reasonable inquiry concerning the matter in this request and the information known or readily obtainable is insufficient to enable Responding Party to either admit or deny this request.

See Boyle Decl. Ex A (Claimant Yu Responses) & Ex. B (Claimant Qi Responses).[2]

Claimants did not notice depositions of any of the Victims or serve any process on any Victim pursuant to Fed. R Civ. P. 45.[3]

## II. RELEVANT LAW

### B. Summary Judgment Standards

Fed. R. Civ. P. 56(a) authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See also Stefan D. Cassella, Asset Forfeiture Law in the United States (2d ed. 2013) (hereinafter, "Cassella"), § 11-15 ("Either party may move for summary judgment in a civil forfeiture case pursuant to Rule 56 of the Federal Rules of Civil Procedure. If

---

[2] Prior to the consolidation of these actions, Claimant Yu had previously responded to a first set of Request for Admission, which generally addressed certain alleged wire transfers, but did not focus on the fraud upon the Victims.

[3] The parties previously discussed the possibility of depositions of the Victims by written questions, to which Claimants objected, but as described herein, Claimants' decision to neither admit nor deny the RFAs rendered this issue appropriate for summary judgment.

the motion relates only to the forfeitability of the property, and not to the claimant's innocent owner defense, it is styled as a motion for partial summary judgment.").

The movant bears the initial burden of establishing "the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)). The burden then shifts to the adverse party who may not rest merely on allegations or denials in its own pleading. See Fed. R. Civ. P. 56(c). Instead, in order to avoid summary judgment, the adverse party's response must affirmatively show a genuine dispute as to a material fact by setting out specific facts in the record. See Fed. R. Civ. P. 56(c)(1)(A).

The non-moving party may not merely attack or discredit the moving party's evidence. National Union Fire Ins. Co. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983). Instead, the non-moving party must affirmatively present admissible evidence sufficient to create a genuine issue of material fact for trial. Celotex, 477 U.S. at 324. The Ninth Circuit has recognized that "[c]onclusory allegations unsupported by factual data will not create a triable issue of fact." Marks v. United States, 578 F.2d 261, 263 (9th Cir. 1978) (citation omitted). Moreover, more than a "metaphysical doubt" is required to establish a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-88 (1986).

12

**C.    Forfeiture Pursuant to 18 U.S.C. § 981(a)(1)(A)&(C)**

18 U.S.C. § 981(a)(1)(A) provides that "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property" is subject to forfeiture. Sections 1956 and 1957[4] require the Government to establish, <u>inter alia</u>, a "financial transaction represent[ing] the proceeds of some form of unlawful activity," and includes a list of such specified unlawful activity ("SUA"), stated in 18 U.S.C. § 1956(c)(7). Subsection (c)(7)(A) defines such SUA to include "any act or activity constituting an offense listed in section 1961(1) of this title," which includes violations of 18 U.S.C. § 1343, relating to wire fraud.

18 U.S.C. § 981(a)(1)(C) states that "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting 'specified unlawful activity' (as defined in section 1956(c)(7) of this title)" is subject to forfeiture. As described above, § 1956(c)(7)(A) includes violations of 18 U.S.C. § 1343 as one such SUA.

In summary, in a civil forfeiture action under subsection (A) or (C) of § 981(a)(1), such this one (<u>see</u> CMC, ¶ 90-93) the Government must first establish the commission of an underlying SUA, and if it succeeds in doing so, must then establish that the defendant <u>res</u> is either proceeds of such SUA (<u>see</u> CMC, ¶ 90-91), or involved in one or more transactions representing such proceeds. <u>See</u> CMC, ¶ 92-93. The existence of such an SUA is thus a threshold element in a civil

---

[4] 18 U.S.C. § 1960 concerns unlicensed money transmitting businesses and is not relevant here.

13

forfeiture action such as this: a defendant <u>res</u> cannot be forfeited if the Government cannot establish that an offense giving rise to forfeiture was committed.

Pursuant to 18 U.S.C. § 983(c)(1), the burden of proof is on the Government to establish, by a preponderance of the evidence, that the defendant <u>res</u> is subject to forfeiture. <u>See United States v. $133,420 in U.S. Currency</u>, 672 F.3d 629, 635 (9th Cir. 2012); <u>See also United States v. Dodge Caravan Grand SE/Sport Van</u>, 387 F.3d 758, 761 (8th Cir. 2004) (the Civil Asset Forfeiture Reform Act of 2000 "places the initial burden on the government of proving by a preponderance of the evidence that the defendant property is subject to forfeiture," although the preponderance standard "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence").

In this case, the CMC alleges that the SUA generally consists of violations of 18 U.S.C. § 1343, relating to wire fraud. <u>See</u> CMC, ¶¶ 91, 93.[5] The Ninth Circuit has stated that the elements of wire fraud generally include the following:

> First, some person knowingly participated in a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises;
>
> Second, statements made or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;
>
> Third, such person acted with the intent to defraud, that is, the intent to deceive and cheat; and

---

[5] In addition, one of the victims (Victim Company 2) is a financial institution, and thus the government also alleged bank fraud under 18 U.S.C. § 1344 in the CMC. For the purposes of this motion, however, the government relies solely on § 1343.

Fourth, such person used, or caused to be used, an interstate or foreign wire communication to carry out or attempt to carry out an essential part of the scheme.

See Ninth Cir. Model Crim. Jury Instruction No. 15.35 (modified for civil in rem actions). In addition, the Circuit notes in the model jury instruction that "[i]n determining whether a scheme to defraud exists, [the jury] may consider not only the defendant's words and statements but also the circumstances in which they are used as a whole." Id.

In summary, for the Government to prevail under either of the causes of action alleged in the CMC, it must first establish, by a preponderance of the evidence, that some or all of the Victims alleged in the CMC were victims of wire fraud, in violation of 18 U.S.C. § 1343, as defined by the Ninth Circuit. Only then is the Government put to its burden of proving tracing and/or involvement between the offense(s) established and the defendant res.

III. ARGUMENT

    A.    The Court Should Find there is No Factual Dispute as to the Fraud Upon the Victims

As detailed above, forfeitability in a civil forfeiture action such as this effectively has two parts: (1) establishing the commission of one or more underlying SUA, and (2) establishing the tracing between that SUA and the defendant res. The evidence conclusively establishes the first of these elements, and the second is not the subject of this motion.

Plaintiff's undisputed facts, as identified in the SUF, rely on sworn statements from the Victims describing how they were defrauded through false statements by persons unknown. This evidence establishes that these false statements were material, in that these

15

false pretenses caused the Victims to transfer money or incur debt to the benefit of the fraudsters. See SUF ¶¶ 3, 8, 17, 24, 33, 39, 47-48, 55, 61, 70-71. The Victims also each state their belief that the representations or promises made to them were false or fraudulent, and the basis for such belief. See SUF ¶¶ 2, 9-10, 19-20, 23, 34, 42, 50, 58, 64, 72. Finally, the evidence also establishes the requite interstate nexus, either through interstate or foreign transfers, or interstate or foreign wire communications. See SUF ¶¶ 22, 27, 32, 37, 40, 44, 45, 49, 52, 60 66-67, 74-76. These facts have not been disputed through discovery.

To oppose summary judgment, a nonmovant must offer some form of affirmative evidence disputing the evidence put forward by the movant; a general denial or attack on the movant's evidence is not enough, and neither is a simple assertion of bias or attempt to undermine the affiant's credibility. See Kaminska v. Lai, No. CV 19-1577-MCS (JEM), 2021 WL 536511, at *2 (C.D. Cal. Jan. 19, 2021), (a party "cannot avert summary judgment by simply raising issues as to the credibility of the moving party's evidence."); Gussin v. Nintendo of Am. Inc., No. CV 93-4308 LGB (BX), 1994 WL 747889, at *14 (C.D. Cal. Oct. 6, 1994)("Bias alone does not create a genuine factual dispute, nor does it otherwise entitle Plaintiff to a jury trial"); McGuigan v. City of Fontana, No. EDCV1000278DMGVBKX, 2011 WL 13223888, at *4 (C.D. Cal. Jan. 26, 2011)(where evidence submitted shows that affiant had a reasonable belief, nonmovant must provide evidence to contradict the affiant's version of events, and cannot simply assert that affiant was not credible or should have done more thorough investigation).

Nor would the Claimants' desire to cross-examine the Victims at trial be a basis for denying partial summary judgment here. See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Argonaut Ins. Co., 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert summary judgment."). Neither could the Claimants seek to oppose partial summary judgment by challenging the diligence or lack of guile of the Victims, because the wire fraud statutes are intended to protect the skeptical and gullible alike. See United States v. Maxwell, 920 F.2d 1028, 1036 (D.C. Cir. 1990).

Ultimately, there is little to dispute here. Claimants have already taken the position during discovery that they could neither admit nor deny the facts alleged by the Victims in response to the Government's RFAs, despite a purported "reasonable inquiry." See generally, Boyle Decl., Exs. A, B (responses to RFAs). Even if Claimants had intended to generate evidence during discovery that might contradict the Victims' version of events, Claimants' time to do so has long since passed. Discovery is closed, and Claimants did not attempt to depose the Victims or otherwise seek evidence from them pursuant to Fed.R.Civ.P. 45. Neither did Claimants supplement their responses during discovery in order to disclose any newly discovered evidence. Claimants simply have not produced any discovery to the Government which would provide a basis for opposing partial summary judgment here. In summary, the Government's evidence stands unrebutted, and nothing has changed since the Claimants were unable to deny the RFAs which might give Claimants a basis for denying some

of the very same facts now.[6] Put another way, a general denial is insufficient at this stage, and what Claimants could not deny then, they still cannot deny now. Accordingly, the Court should grant partial summary judgment.

## IV.  CONCLUSION

For the foregoing reasons, the Court should grant the Government's motion for partial summary judgment and sign the Proposed Order attached.

Dated: March 18, 2022        Respectfully submitted,

TRACY L. WILKISON
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
JONATHAN GALATZAN
Assistant United States Attorney
Chief, Asset Forfeiture Section

  /s/
DAN G. BOYLE
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA

---

[6] For the same reason, Claimants cannot seek to evade summary judgment on this issue pursuant to Fed.R.Civ.P. 56(d), which provides that a court can defer consideration on a motion for summary judgment, including to allow time for discovery to take place, where the nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."